Good morning, your honors. May it please the court, Thomas Piskorski on behalf of defendant, appellant, and cross-appellee LexisNexis, now known as First Advantage. Your honors, the trial evidence in this case does not support a $375,000 jury verdict or the $225,000 judgment that the district court entered. It's a trial record issue. I'd like to highlight what we consider to be the most important pieces of the trial record. Number one, the record reflects that there's no other case where the failure to require the entry of a middle name or initial created an error. Not one. Throughout the entire trial, not a case even similar to this one came up. Number two, the reasonableness of... Which way does that cut? I think it supports us, your honor, in terms of at the time the report was done, there was nothing suggesting that our procedures were unreasonable because we didn't require a middle initial. There was never a problem in requesting but not requiring. You're saying it never came up with LexisNexis before? Is that the point? It never came up as a problem or an issue, your honor. Correct. Do you categorize your cases? Every LexisNexis search that's ever done, do you categorize it in a way that would tell you this is the middle initial problem file and you just have one entry in it? Well, the trial record doesn't reflect that, but the testimony was there are procedures in place to monitor any problems as they arise and there's no evidence that there was ever a problem because a middle initial or name was requested but not required. I mean, I just don't know what that means if we don't know how you keep track all of this stuff. Well, but the evidence is there is no problem and the idea that because we never required it, that was inherently unreasonable can't be supported. Unless you have some history indicating there was a problem in requesting but not requiring, it's impossible to draw the inference that therefore that procedure was unreasonable. And I think that's buttressed by the fact that the dispute rate is so low. The trial record evidence indicated that the number of times a consumer disputed information on a And I think in context, it's important to highlight .2% means two out of 1,000 people raised an issue with their criminal background report. Or some people may have had a complaint but just didn't send it in, right? Well, that certainly is true, Your Honor, but that doesn't change the fact that we can only deal with the hard or at all disputing information on their reports. Do I have to weigh that with how easy it would be to avoid this kind of harm? I mean, that's how reasonableness determinations are made in tort law, right? Well, but I think, yes, Your Honor. You know, if it's something that would avoid some occasional harm or even rarely occurring harm but it's very easy to avoid, it may be unreasonable not to avoid it. Except in this case, two answers to that, Your Honor. Number one, there are a lot of vagaries with a middle name or initial. Some people don't have them. Some people have multiple middle names. Some people use acronyms such as Dick for Richard or Peggy for Mark. I just don't see why that necessarily would be too difficult. I mean, can't you just have a little block on there, check here if you have a middle name? I think you do. We do, Your Honor. It's simply, it's a field that the customer doesn't, isn't required to fill in. Why can't you require it and if someone doesn't have a middle name and they check a box next to it, I don't have a middle name? Well, we could require it, Your Honor, but the- It's extremely easy to require. Yes, except a middle initial, middle name doesn't carry, there's a lot of false positives by relying on a middle name or initial. LexisNexis instead used- How about with relying on a birth date? Well, that's exactly right, Your Honor. Well, the birth date is not- You want to eliminate as many false positive problems as possible. Don't rely too much on the birth date, don't rely too much on the middle initial, but if you use both, the odds are high you're getting closer to the right person. But the date of birth is a concrete piece of information as an identifier. You can't change it, you can't put in incorrect information, it's rock solid. And that's the identifier- I don't understand why, in addition, requiring that you either check no middle name or put a middle name in there. Why would that, in addition, be difficult? Because there is the risk, the trial evidence indicated that there is a risk that you might get a false positive or a false negative. You're more likely to catch someone with more information? No, you're actually going to put somebody's wrong name on a report, wrong information on a report by using a middle name, then relying on the date of birth. The date of birth- Wait a minute, using a middle name, I guess I just don't understand this now, what you're arguing. If you have three items that will exclude people from having the report and it gets a thousand people and you add another filter and it narrows it down to one or two, where's the false positive in there, I don't understand. Well, the trial evidence indicate that it's possible because of people changing their nicknames or shortening their nicknames or not having a nickname, that you could run into issues. Granted, the- The name is the first name, I'm talking about a middle name. Well, but a lot of people use nicknames for their middle name, Your Honor. You know, Richard, they'll use Dick or- I don't think somebody whose name is Richard and who goes by Dick puts Dick in, puts types into a form, Richard, Dick. Well, the problem is a lot of consumers aren't that careful about what they input in terms of their data, but- Problem with birth dates. True, Your Honor. There's a problem with every piece of information, of course. But the date of birth is deemed to be the most reliable indicator of accuracy. Sure, but nobody's saying you shouldn't use the date of birth. Well, I guess- I mean, that's not the argument. Sure, you should use the date of birth. Why not? But the question is, are we unreasonable in not also requiring a middle name? We ask for it, we don't require it. Whether it's reasonable in part depends on, I guess, what the risk is, but it also depends in part on how easy it is to do. And I'm just not understanding why it's not easy to do. Well, Your Honor, I'm not disputing that it's not easy to do. Easy without causing problems. Well, but the question- People can put Dick in their first name. Agreed. I'm not fighting about whether it would have been easy to do. But in terms of measuring- If it's really, really easy to do, then it's kind of unreasonable not to do it. Well, I don't think so, Your Honor. Not when the evidence indicates there never was a problem in not requiring a middle name. I mean, the dispute rate is extremely low. Even the mixed- The reality that the name was David Smith. I mean, the only thing more common would have been John Smith. I mean, you gotta be anxious when you have a name like that. But, Your Honor, we only came up with one David Smith, and talk about the wild improbability. A David and a Smith born on the same month, same day, over 50 years ago. It is that wild. That's the point. David Smith is a common name. But not with that date of birth. That's not surprising there was one. But not with that date of birth, Your Honor. I understand your point. That's the oddity. I get that point. But why wouldn't you- You already asked for the middle initial. I would think you'd require it across the board. But why wouldn't you certainly pay attention to it when you have a common name? Well, we did ask for it. But again, you're right. We didn't require it because of the judgment that the date of birth was a far more accurate indicator. An indicator of accuracy than any middle name or initial would be. And the data backs that judgment. It's not more accurate than using the date of birth and the middle initial. Except for those cases where the middle name or initial might create a problem in terms of a false positive. The record doesn't show any hard cases of that. But that was the judgment of the company in designing its system that we will ask for it. But because date of birth is a far more reliable indicator of accuracy, that's the one we're going to rely upon and require. You think if this person's name was John Smith, that wouldn't require any further investigation? Whether it's a John B. Smith or John C. Smith? Like that? Yes, if you're just looking at the names. But it's the date of birth that's the critical. Same date of birth. There must be a lot of John Smiths with the same date of birth. Well, but your honor, in this case, there was one. There was just one person for that company. I'm sorry, your honor. With a criminal record. Yes, yes, of course. Probably some others without a criminal record. Oh, of course, your honor. Of course. I mean, probably hundreds of thousands of David Smiths. I don't see why the fact that date of birth is more accurate means you couldn't do this in addition. Well. I mean, I take your argument that it might cause some difficulties and it's a pretty rare instance where it's going to cause harm. And the harm's not really all that great because the person who receives the notification can tell instantly that it's wrong and can complain about it and knows that it'll eventually get fixed. But even so, I'm having a hard time seeing why it was difficult to do. But the question. The false positives, I'm still not understanding that. Because the standard is unreasonable procedures. That's a statutory limit. But unreasonableness has meaning. I mean, if you ever do tort law, you know, I mean, you balance. Agreed. You balance how hard it is to do compared to how much harm is, you know, ever since learned at hand. But you always also look at what's reasonable under the circumstances. And with the long history of LexisNexis, using the date of birth as the key identifier, there never was a. Can I just make sure I'm following something? So for you all, the Eureka moment was, well, this worked perfectly because we only found one David Smith with that birth date who had a criminal record. That was the Eureka thing. We must. This must be an alignment because it's a David Smith with the same birth date, right, who had a criminal record. That was the lineup of things that said, we don't need to check more. Even though there are plenty of David Smiths without criminal records and that birth date. But that's the information that the customer client provided. That's crazy. Why is it of any meaning at all that there's another David Smith with that birth date if all you care about is a David Smith with that birth date with a criminal record? That's just, I don't, that's very bizarre to me. But that's what a CRA, what a CRA fundamentally does is takes the information provided by the customer and does searches. It's a specific word search. And in this case, they found one David Smith with that date of birth. With a criminal record. Correct. Without telling you the number of David Smiths with that birth date without a criminal record. But that's not part of our information process to provide the customer, Your Honor. Exactly why you ought to have other filters. The judgment, because at the time this report was done, there never was a problem with requesting but not requiring a middle name. The company's judgment was the date of birth is a far more reliable indicator than any other identifier. We have that. Okay. But I think the key point on that, Your Honor, is the data supports that. The mindset of LexisNexis at the time of this report in December of 2012 indicated we don't have a problem with not requiring a middle name or initial. The requesting of it and the use of the date of birth as a required field is producing accurate reports. Granted, this one was inaccurate. Of course. Can you address the difference between willful and negligent? Assuming that this was negligent, does that mean it was willful as well? It does not, and that's certainly one of our arguments, that there is a dichotomy between the two. And willfulness, reckless disregard, I mean, LexisNexis was not doing anything disregarding the law or recklessly disregarding the law. They understood its obligations. They knew what was required. They had the proper procedures. They monitored their procedures. They reviewed their data. Didn't the information in front of them show that there was a disparity between the two David Smiths, that they had a David Smith with one initial and a David Smith with a different initial? What do we do about that? At least the Seventh Circuit has said that a consumer reporting agency isn't required to examine every record and perform an analysis, and where they find anomalous information to then do an investigation. That would be cost prohibitive in light of the enormous amount of information that is out there that consumer... How about just looking at the right name? Well, but that's not what a consumer reporting agency does. They're there to provide information. The customer and client can review it and decide what value it has, but our job as the CRA is to provide information that matches the data that's provided. And that's what we did here, and we did it accurately. Granted, this was a one in how many million possibility to... Yes, would you call it reckless if there was actually evidence that the fellow looked and realized one's David A., one's David O., and said, well, big deal, who cares, and passes it on? Would you call that reckless? Maybe, but there's no evidence of that, Your Honor. There isn't any kind of human analysis of the data, because it's just data being generated based on the identifiers being provided. And the middle initial came from a third party, the Equifax company, which does the credit reporting work that then is provided to Lexis, and LexisNexis then provides to the customer. So sure, Your Honor, if they sat there and said, holy smokes, this doesn't match, but let's send it anyway, that's a different case, of course. But that's not our case. Thank you, counsel. Thank you, Your Honors. Good morning, Your Honors. May it please the court. Jim Francis for the appellee, David Allen Smith. My client's position is pretty simple and consistent. The jury's verdict, in this case, should stand in its entirety. As an initial matter, I think it's worth noting that what's not before the court, what LexisNexis has not argued, was that there was any flaw with the conduct by which this trial occurred. There's no argument that there were any evidentiary rulings that were improper, that the court improperly instructed the jury, that Vardir was somehow flawed. There's no challenge to the conduct of the trial. And the record here is clear that this trial was conducted in an error-free way. As for LexisNexis' sufficiency of the evidence argument, as the court, I think, has already indicated with its questions, it can only win if no reasonable jury could have found against it. In this case, a unanimous jury of eight people did find against it. But there was a lot of discussion in Mr. Piskorski's argument about the middle name. But I want to make it clear for the court that this case was not just about the failure to include a middle name. There were four independent and separate evidentiary bases for this jury to find that LexisNexis recklessly disregarded the Fair Credit Reporting Act. First, it failed to use the best and actual public record. If I may have the panel's indulgence, if the panel would look at Appendix 39 to 40. There was only one public record that was introduced in this case, and we have it, and my office obtained it. They never introduced- Do you have a page ID for that? Yes, Your Honor. It's Appendix 39, 39 and 40. I'm asking for a page ID in the record. You don't have page IDs? I only have the appendix page number. Well, that's a weakness then. We use page IDs in this circuit, and that way we can get right to it. But if you don't have- I think it's page one, now that I see it, Your Honor, I apologize. It's 117 to 118. Thank you. The only record introduced at trial in this case was this record. This is what my office obtained from the Florida Department of Law Enforcement. If the court would just take a look at the record, it shows that the actual middle name for this person was Oscar Lee, not Allen. It also shows that the last four digits of the Social Security number is 5133. If you compare that with the Social Security number that LexisNexis had, they don't match. That's item number one. Could a jury- That came from the Florida Department of Corrections or whatever the official name was. Yes, the Florida Department of Law Enforcement, Your Honor. They didn't use Social Security numbers. Is that the idea? Well, if you look actually at Smith 117 and Smith 118, it mentioned they stopped- Page ID shows authority for jury instruction. Is that what you're referring to? I apologize, Your Honor. But you're making the point that they had in front of them the mismatch, that there were different initials, and that that's enough to show recklessness. That's your point? Yes. Well, for that, right, for this is one piece of the four. So this is just one piece of the four evidentiary rulings. But as for this, this record existed. They could have looked at it and compared it with the information that was- So what I find hardest about this case is where the line is from negligence to recklessness. I grant you there's enough for negligence in this case, and that would be one. But there are other things, but it's not obvious to me. This is a pretty big verdict for what looks like a bureaucratic snafu. Your Honor, this is not a bureaucratic snafu. First of all, without having the actual public record, how can you report it out subject to the FCRA's maximum possible accuracy standard? Reasonable people could think, and I think in this case did find, that the failure to even look at the underlying public record could never lead to maximum possible accuracy. How can you report it? I think it's a stretch, but I think you could let a jury find that. It's hard to see how it was reckless, though. Well, Your Honor, it's reckless because- It's not the same thing. Reckless is not the same thing as they weren't careful. The standard is maximum, yeah, and it's not maximum if you don't do certain things. But you don't have to do everything. I mean, you don't have to- because it's reasonable, right? Your Honor, that would- You don't have to hire an investigator for every one of them. That's the whole- you are the investigator, right? Yeah, well, we're not saying, Your Honor, that they had to hire an investigator, but if you're going to- That's what you would do if you had to do the absolute maximum, so the standard can't be that. It's reasonable, right? Well, it's a reasonable procedure to assure, to guarantee- Well, not if you guarantee. I'd say the only way to guarantee it is to hire an investigator. Well, our argument, Your Honor, respectfully, would be- It can't be that you have to guarantee it, right? I'm sorry? It can't be that you have to guarantee it. Otherwise, you have to pay punitive damages. That just sounds remarkable. No, but you have to have procedures in place that are designed to assure maximum possible accuracy. We argue- You're really focused on the negligence standard, and I think he's asking a question about the recklessness point. No, Your Honor. Under SAFCO and under this Court's analysis and the Bok cases, the standard is reckless disregard for the FCRA. Does it create an unjustifiably high risk of harm? Here, the jury could easily find this would not take more than two seconds to look at the actual public record before reporting it out and see that it didn't match. If you're going to report public records- How did their system work? Wasn't it just computer driven? Yes. Okay, so what you're saying is it's punitive damages worthy to only have a computer generated system. See, I mean, I can understand how you could have negligence with a computer generated system and say, you have to have this filter, you should have this filter. But I really think you're making an argument that prevents them from providing this service through computer services. Not at all, Your Honor, and I can explain why. Because their computers could be designed to cross-reference data in the underlying fields without anybody looking at it. CRAs do it every day. Equifax did it in this case, which is why it was able to find the middle initial A. So if I could just turn to the other pieces, because this is not the only piece that was before the jury. The jury also had the issue which the court has already heard about, which is that in their files, LexisNexis had the middle initial from Equifax, one of the three biggest credit reporting agencies in this country. So they had in their possession a different middle initial than the one that pertained to the record. They didn't use it. Could a jury find that the failure to simply look at or have your computer system look at the middle initial created an unjustifiable risk of harm? Absolutely. They didn't introduce any evidence that it would cost any money, that it would be suit suit. So burdensome in order to require them to do that. That's where the recklessness comes from. Your friend, go ahead, go ahead. Just seemed like you were defining negligence there. Where's the recklessness? The recklessness- Is recklessness just sort of an epithet on negligence? No, Your Honor. An epithet on negligence. No, Your Honor. Recklessness is disregarding what you have in front of you. I think what the court's asking is should you go get an investigator to go out and get all this additional information? The answer is that might be negligent to fail to do that. But to not use what you have in your possession, that's a reckless disregard. When your standard is maximum possible accuracy. Does LexisNexis know the middle initial of your client? Well, they knew it through the credit report they got from Equifax, yes. In addition, I need to correct something that's been stated several times earlier, which was that there was no evidence of this problem prior. Totally contradicted by the record. The problem here was misattributing someone else's criminal record to somebody. Somebody else. They, in four states alone, they had 800 separate instances, or approximately 800 separate instances of somebody complaining and them removing it. I thought he was saying middle initial problems. Aren't you raising the level of generality when you talk about all these other problems? They weren't the same type of problem, right? Well, the problem here is that someone else's criminal record ended up on my client's report. That's not a failure to use middle initial alone case. That's a misattribution case. No, you're raising the level of generality. That's my point. And I'm just saying, is that really helpful to us in showing recklessness? Oh, I think all of this evidence to have in front of you that the court, that LexisNexis... So if that's accurate, if we write an opinion that says this supports it, it means every time they have negligence and misattribution, the argument you're making here raises it up to recklessness. No, your honor. It's when they have multiple sources of information coming in and multiple abilities to get it right and they don't do it. This is not a case simply about a middle initial. In addition, I think as Judge Rogers, you indicated earlier that there was no policy here at all. And the jury heard this, that for dealing with common names, David Smith, John Jones, don't you think that it would be reasonable in cases where someone has a common name to maybe take a little bit extra step and be a little more careful when you report out... That's hard for a computer program, isn't it? Oh, not at all, your honor. Not at all. You could require additional information in the case of a common name, require previous address, current address, require suffix, just like the CFPB just required GIS to do, just like the attorneys general of the United States required all the credit reporting agencies to do in the 90s. This issue about... So they have common name fields and extra requirements for common names? I've just never seen that. Maybe my name's not common enough, but there really are. So there are programs out there that deal with the Smiths and other common name... Well, I don't know that I'm saying that. I think what I'm saying is their system can be designed to do whatever they want it to do. You just said lots of other people are doing this. You didn't mean it that way? No, what I mean is in lots of other contexts, other companies are requiring more data than they do. For example, this credit reporting agencies require more data than they do before issuing a claim. Does anyone have a common name field where we ask a bunch of different questions, additional questions, if it's decided that it's a common name? I don't know that there was... There was an evidence before the court as to somebody else having that program, but I think the FTC made a very... This is your third point. I'm asking about that point, the common name point. Your idea was that when they identify a common name, they should have more filters. You're saying that's example number three of recklessness, but yet you're not saying you know of anywhere else where that's what they do when they're in this kind of a world. That would strike me as proving it's not even negligent. No, no. I see your honor. That recklessness. I see your honor. What I'm saying is because of the problem of mixing people with the same names, other consumer reporting agencies have different matching criteria, more strict matching criteria. You can't even get a credit card online without inputting more information that they require. You can't get a credit report from Equifax without requiring more information. Is that in the record? That is... I'm sorry? Is that in the record or is that just what's general knowledge? I would say that what I just said about the credit card, that's not in the record, your honor, but that's certainly the type of thing that a jury could think of. That's their... That's the experience that they come from. Can I ask just a question that goes to sort of the nature of the tort system in general? Usually you have a system where you may not know that something of the person, an actor, like in this case, LexisNexis, may not know the complete contours of what they're required to do. And they do something which doesn't balance the probability and the harm against the cost of complying with a certain kind of requirement. And so they get a judgment for compensatory damages and they have to pay, and sometimes it's substantial, like $75,000. And so they factor that in and if they don't want to lose money, they change their practices. That's how the tort system works. The punitive damage is to punish for something that they should have known ahead of time. That's normally speaking, that's how it works. Is it working differently in this system? Because it seems like you can make a pretty strong case that they should have anticipated this and they should have anticipated that and they should have been able to do this and they should have been able to do that. And those are hard decisions. That's why we give them to the jury, because they're fact-laden as well as legally laden and we let a jury make that decision. And then in the future, the company would be well advised economically to take that into account and fix it. And in the meantime, the person who suffers gets compensation. The question to me is whether they should be punished. Are you with me? Yeah, I'm with you, Your Honor. And I think if they did see something and say, well, to hell with it, nothing's going to happen, then they should get punished. But if they didn't take into account all of these things that the computers could do and all of this kind of stuff, it just doesn't smack of punishable conduct. Well, I can just answer that. See what I'm saying? I do see what you're saying, Your Honor. And what I would say is in this context, the FCRA does not mirror the tort law. Okay. That's what I was asking. The circuits that have looked at this, in fact. So it is more like negligence. We just make them pay. We just punish them for being negligent. It's that upon proof of a reckless disregard, a plaintiff is entitled to recover punitive damages. Right. There's no need to prove them out. So is there a reckless disregard every time you unreasonably identify the wrong person? I think, again, you have to look at the evidence that's presented. Can you think of a situation where it would, where compensatory damages would be warranted but punitives would not or willfulness would not? Sure. Somebody looked at this. A human being looked at both reports and testified that, I'm sorry, I didn't see the middle initial on the Equifax credit report. I didn't see it there. That would be negligent. That might not be willful. What about in the structuring of the gathering of the information? That would always be willful? If it was structured in a negligent way? Well, no. If it wasn't structured to be maximal, in your view, then it would be willful. Well, as I said before, they had 800 other instances just from four states alone, which would extrapolate to be willful. Then with that knowledge and with the duty to assure maximum possible accuracy, and your honors, if I can also mention one other issue here, which I think is very important. In the FCRA context, we're dealing with the sale of criminal records to employers. This is not a credit report to a bank to see if you can get a higher rate, a better rate on your credit card. But criminal records to employers have to be afforded the highest possible level of duty under the FCRA. Are the employers give these reports to the persons about whom they're reported? Yeah. Under a separate section of the Fair Credit Reporting Act, the employer is required to provide the report to the— For this kind of error, the injured person immediately knows that it's an error. Oh, I wouldn't say they immediately know. Generally it's not the case. In the case of the wrong middle initial, they would know. No, because we find that they're often— In this case, he would know. Well, it's put in the mail and you get it three days later, and the job decision's already been made, so it's after the fact. That's what we generally see to be the case, that employers aren't waiting five and ten days to wait for the consumer to dispute. They make their decision already, and they rescind the job. Red lights on. Just one quick question, just to make sure I'm not missing something, but I understand that this is a computer-generated system, and you could say that that's got negligence components to it, and you can say it has recklessness components to it, but we're going to ignore negligence and assume that's all fine and the verdict stands there, but if it's a computer-generated system and you don't have evidence that they have been messing up reports based on minimal initial problems, I mean, how can that be recklessness? Because otherwise, I'm back to the thing I asked you earlier, it just seems once you have a mistake with a computer-generated system, you have to add a new layer of personal looking at all of these applications, which is going to raise the cost tremendously, just really destroy that form of business. What premise of that question am I missing? I think the premise that you're missing, Your Honor, is first, there was no indication at all how much it would cost in order to do anything different than they did. If they wanted to come in and argue, it would be cost-prohibitive for us to sell reports like this to employers, given what the plaintiff wants us to do, it would cost X, Y, and Z extra. They didn't introduce any evidence of that. Second, it's not just about a middle name policy or a middle initial policy. As I said, there are four other issues here. You don't have to say the other issues. Right, right. So there are four other issues involved here, and then you have... Your friend on the other side is right. There were no middle initial problems identified in the record. There were no other problems where they were able to identify when the failure to require a middle name led to this problem. That's very different than was there evidence of misattribution with other criminal records. Clearly they had over 804 states alone. That's notice. That's notice. You have a problem that you're reporting, but basically if you extrapolate, 5,000 people you've already mixed up. That's not notice of recklessness? I mean, come on.  Thank you, Your Honor. Thank you. Three quick points. One, Your Honor, the CRA has a corrective procedure in it. It was used here by LexisNexis. The report was revised within 30 days. Second, with respect to the Florida... That can happen in 30 days, though. Agreed. Agreed. But at least it goes again to the recklessness. We acted. We acted. We realized, okay, we got... There might be a problem. Let's look at it. We fixed it. That's how the statute is designed. On the Florida Department of Law Enforcement, Your Honor, that's a secondary source. The records that LexisNexis uses are actual court records, the primary sources. You didn't have in your possession this record that shows the last four digits of the Social Security number? Did not, Your Honor, because they don't make their information available for purchase like the courts do. That's where LexisNexis accumulates all of its criminal record information from the actual courts. How did that get in the record? Was that put in for trial purposes only? I mean, he's cited to it in the record here. How did it get in there? The lawyer presented that as apparent evidence. It was not through a witness. A jury? Yes, Your Honor. And your client said they never had seen it? Correct. And lastly, on the foreseeability, Your Honor, and I know my time's up, just 10 seconds. On the foreseeability, I do think you have to look at that mixed file rate. That's less than one report out of every thousand. Something had to be removed. And there's no evidence regarding why it was removed, and certainly no evidence is because of the middle initial. Thank you. Thank you, Counsel. Interesting case. The case will be submitted. Please call the next case.